J-A11031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1726 MDA 2019 |

Appeal from the Order Entered September 24, 2019
in the Court of Common Pleas of Columbia County Juvenile Division at
No(s): 75-OC-2019,
76-OC-2019, CP-19-DP-0000064-2015,
CP-19-DP-0000065-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1727 MDA 2019 |

Appeal from the Order Entered September 24, 2019
in the Court of Common Pleas of Columbia County Juvenile Division at
No(s): CP-19-DP-0000064-2015

| | | |
|---|---|---|
| IN RE: D.A.T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1728 MDA 2019 |

Appeal from the Order Entered October 18, 2019
in the Court of Common Pleas of Columbia County Orphans' Court at
No(s): 75-OC-2019

J-A11031-20

| | | |
|---|---|---|
| IN RE: H.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: G.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1729 MDA 2019 |

Appeal from the Order Entered October 18, 2019
in the Court of Common Pleas of Columbia County Orphans' Court at
No(s):  76-OC-2019

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:      **FILED: MAY 20, 2020**

Appellant, G.B. ("Father"), files these consolidated appeals from the Orders entered on October 18, 2019, which granted the petition of Columbia County Children and Youth Services ("CYS" or "the Agency"), and involuntarily terminated Father's parental rights to his minor, dependent children: H.B. (born in October of 2009) and D.B. (born in August of 2013) (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (5), (8), and (b).[1]  Father also appeals from the Orders dated September 17, 2019, and entered September 24, 2019, changing the Children's permanency goal

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By separate Orders on October 28, 2019, the Orphans' Court confirmed the voluntary consent to adoption by A.E.C. ("Mother").  Mother has not filed an appeal to the confirmation of her consent and is not a party to the instant appeal.

- 2 -

J-A11031-20

to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351. After a careful

review, we affirm.

The Orphans' Court made the following findings of fact regarding the

procedural and factual history of this matter:[2]

> 1. Petitioner is Columbia County Children and Children and Youth Services ("Agency").
>
> 2. Natural Mother is A.E.C. ("Mother"). Natural Father is G.B. ("Father"). They are the parents of the minor children D.A.T.B. [born in August of 2013] and H.L.E.B. [born in October of 2009].
>
> 3. Dependency was established on July 14, 2017.[3] The two [C]hildren were placed in foster care on September 14, 2017, with concerns of cooperation [*sic*], truancy, substance abuse, stable housing, and criminal activity, among other reasons.
>
> 4. The [C]hildren have been in their present foster home since September 14, 2017. The present foster parents have one natural child, age 15, and wish to adopt the two [C]hildren. The home is stable and the [C]hildren are well cared for and have a bond with the foster parents.
>
> 5. The agency established a Family Service Plan [("FSP")] in 2017, requiring parents to cooperate and address other issues including truancy, substance abuse, stable housing, and criminality. Father and Mother have failed to comply with the requirements of the [FSP].

_____

[2] As Mother did not appeal the termination of her parental rights, we focus on the Orphans' Court's findings regarding Father.

[3] Although the court averred that dependency was established on July 14, 2017, the record reflects that the Children were taken into the custody of CYS on September 14, 2017. *See* Temporary Protective Custody Order, 9/14/17, at 1. The Children's dependency dockets indicate that they were adjudicated dependent on October 30, 2017, although no order of adjudication appears in the certified record.

- 3 -

. . . .

8.  Father has an extensive criminal record.  Recently, he pleaded guilty to offenses in Luzerne County.  Several of the charges involve possession of drugs.

9.  Father has not been a resource for the [C]hildren.  In 2017, Father attended two scheduled visitations of four scheduled visits.  In 2018, Father attended four scheduled visitations of 26 scheduled visits.  Father alleges that he did not know he could visit the [C]hildren due to false allegations from [Mother].  Father testified that within the last year he sent one birthday present to the [C]hildren.  Father saw the [C]hildren for about six (6) hours in the two years preceding June 2018.  From June 2018 until August 2019 he did not see the [C]hildren at all.  Since August 2019, he has seen the [C]hildren a few times through [CYS] until the hearing.

. . . .

14. Since September 14, 2017, Mother and Father have failed to provide for the [C]hildren's basic needs.  In regard to the services provided by [CYS], Mother and Father completed the drug and school program.  However, they failed to submit drug screen tests and to successfully address substance abuse issues.  Further, they have failed to provide stable housing for the [C]hildren.

Orphans' Court Opinion, 11/26/19, at 2-3.

On April 5, 2019, CYS filed petitions to change the Children's permanency goals to adoption.  **See** Pet. For Goal Change to Adoption, 4/5/19, at 1.  On April 15, 2019, CYS filed petitions to involuntarily terminate Father's parental rights as to Children under 23 Pa.C.S.A. §§ 2511(a)(1), (5), (8), and (b).  **See** Pet. For Involuntary Termination, 4/15/19, at 1-3.  The Orphans' Court held a hearing on the petitions on September 17, 2019.  The court heard testimony from Brittany Hacker, CYS caseworker; Father; T.A., Father's

paramour; and J.C., Father's sister-in-law.[4]  Notes of Testimony ("N.T."), 9/17/19, at 6-122.  Additionally, CYS entered into evidence CYS Exhibits A-J.  *See* CYS Ex. A-L; N.T., 9/17/19, at 81.  The Children were represented by Michael Wintersteen, Esquire, as guardian *ad litem*.[5]

By Orders dated September 17, 2019, and entered on September 24, 2019, the Orphans' Court found it in the best interest of the Children to change their permanency goal from reunification to adoption.  ***See*** Order, 9/24/19, at 1.  By Orders dated September 24, 2019, and entered October 18, 2019,

---

[4] Mother was not present at the hearing, as she was in a drug rehabilitation facility and had signed a consent to adoption.  Notes of Testimony ("N.T."), 9/17/19, at 4.

[5] Mr. Wintersteen stated at the hearing that he could represent both the legal and best interests of the Children.  ***Id.*** at 125; ***see also In re T.S.***, 648 Pa. 236, 192 A.3d 1080, 1089-90, 1092-93 (2018) (reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests); ***see also In re: Adoption of K.M.G.***, 219 A.3d 662 (Pa.Super. 2019) (*en banc*), *granting appeal in part*, 221 A.3d 649 (Pa. 2019) (holding that this Court has the authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation).

Specifically, Mr. Wintersteen stated that it was in the best interests of the Children to be adopted, and that H.B. wanted to be adopted.  ***See*** N.T., 9/17/19, at 125.  With regard to D.B., Mr. Wintersteen stated, "[H]e's hard to talk to.  That's why I asked the question, he does have -- I don't know what he has, I don't know if it's ADHD.  He's six, he's very hard to talk to and I did the best I can."  ***Id.***  The Orphans' Court spoke to both Children in chambers, where D.B. stated that he loved his parents but did not want to live with them, and H.B. stated that she wanted to stay with her foster parents and be adopted.  ***Id.*** at 125-135.  The Court concluded that D.B. was immature and not able to make a reasoned decision as to his best interests, and that H.B. was able to make a reasoned decision to stay with her foster parents.  ***Id.*** at 133-35.  Accordingly, the requirements of ***T.S.*** are satisfied.

the Orphans' Court found clear and convincing evidence to terminate involuntarily Father's parental rights as to the Children under 23 Pa.C.S.A. §§ 2511(a)(1), (5), and (8). *See* Order, 10/18/19, at 1. The Orphans' Court additionally concluded that termination of Father's parental rights was in the best interest of the Children under 23 Pa.C.S.A. § 2511(b).

Father filed four separate, timely, counseled notices of appeal, each containing a single docket number pertaining to each child. Additionally, Father filed four counseled statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925. On November 13, 2019, this Court *sua sponte* consolidated Father's notices of appeal, and, on November 26, 2019, the Orphans' Court filed an Opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Father raises the following issues for our review:

I. Did the [Orphans' Court] abuse its discretion in involuntarily terminating the parental rights of Father?

II. Did the [Orphans' Court] abuse its discretion in changing the dependency goal from reunification to adoption?

Father's Brief at 5[6] (suggested answers omitted).

We review Father's claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans' court] if they are supported by the record. If the factual findings are supported,

---

[6] For ease of analysis, we have re-ordered Father's claims.

appellate courts review to determine if the [orphans' court] made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [Orphans' Court's] decision, however, should not be reversed merely because the record would support a different result. [Our Supreme Court has] previously emphasized [the appellate courts'] deference to [Orphans' Courts] that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013) (quotation marks, quotations, and citations omitted). "The [Orphans'] Court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Subsection] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In the case *sub judice*, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (5), and (8), as well as Subsection (b), which provide as follows:

- 7 -

## § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(1), (5), (8), and (b) (bold in original).

Father first contends that the Orphans' Court erred in determining the Agency met its burden of proof under 23 Pa.C.S.A. §§ 2511(a)(1), (5), and (8). We have long held that, in order to affirm the termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a), as well as Subsection 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, with regard to Subsection 2511(a), we conclude the Orphans' Court properly found that the Agency met its burden of proof under Subsection 2511(a)(1).

It is well-established that "Section 2511[(a)(1)] does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." **In re Adoption of Charles E.D.M.**, 550 Pa. 595, 708 A.2d 88, 91 (1998) (citation omitted). In addition,

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

- 9 -

*In re N.M.B.*, 856 A.2d 847, 854-55 (Pa.Super. 2004) (citations omitted).

This Court has defined parental duty as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with ... her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

We have stated that the Orphans' Court must next consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (quoting *In re Adoption of Charles E.D.M.*, *supra* at 92).

- 10 -

Additionally, with respect to incarcerated parents,

Applying [*In re: Adoption of McCray*,] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [*McCray*, 460 Pa. 210, 331 A.2d 652, 655 (1975)]. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

* * *

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 828 (2012) (*quoting*

*McCray*, 331 A.2d at 655) (footnotes and internal quotation marks omitted).

In the case *sub judice*, in terminating Father's parental rights, the

Orphans' Court indicated the following:

Father alleges that he has made great efforts to keep in contact with the [C]hildren and he did not know he could visit them due to false allegations from [M]other. However, [F]ather could have easily contacted the [A]gency for further contact information. The [C]hildren were removed from Mother's care largely because of her continuing drug use and living conditions on September 14, 2017. Father was not an available resource to take care of the [C]hildren at that time. Since 2017, Father made token efforts to comply with the family service plan and to provide a safe and permanent home for the [C]hildren. It was not until 2019 that he initiated contact with the [A]gency and foster parents.

Father has no bond with [D.B.] and minimal bond with [H.B.]. He only had six visitations from 2017 through August 2019. He has not had custody in over two years. [The Children] do not know him. [H.B.] is old enough to remember him and have a slight bond. However, in her young mind she does not understand the ramifications of suddenly being in her [f]ather's custody in a strange place with different people. She does not understand that the chance for a healthy physical and emotional life will be greatly jeopardized if she is taken from her stable, healthy environment and placed in a very undefined environment.

Father's plan for the [C]hildren seems questionable, tenuous, and unrealistic, at best. His significant-other seems well-meaning, although her advocacy and plan for helping Father does not realistically address the best interests of the [C]hildren and their need for stability and permanency.

Father seeks to relocate to Bloomsburg to live with his brother, sister-in-law, their two children, and the [C]hildren. There was minimal evidence concerning the suitability of Father's proposed relocation to his sister-in-law's house. It is questionable whether one home can house all of them without a detriment to the [C]hildren.

Father works at a Dollar Tree Store. Although the sister-in-law testified that she would be able to take care of the [C]hildren when needed, there is no financial plan for taking care of the [C]hildren.

Father currently faces criminal charges in Luzerne County. Perhaps after the criminal charges are adjudicated, Father will become enlightened and find stability . . .

In this case, Father has failed to perform parental duties. In addition, well over six months have elapsed from the service plan and permanency plan, Father has not complied with the plans and has not met the [C]hildren's needs. Finally, prior to the filing of the petition, over twenty-two months elapsed from the date of the [C]hildren's removal and placement, and the conditions which led to their removal persist, and the termination of parental rights would best serve the needs of the [C]hildren . . .

. . . Not only has Father failed to perform parental duties for the [C]hildren since September 14, 2017, there is no indication that he will be able to do so in the near future . . .

Orphans' Court Opinion, 11/26/19, at 7-11.

Father, however, argues that CYS did not prove by clear and convincing evidence that his parental rights should be terminated, because the concerns leading to the Children's placement were unsubstantiated. *See* Father's Brief at 15-16. Father points to a negative drug test taken in 2017 to bolster his point. *Id.* at 15. Father additionally contends that CYS contacted him only twice – in November 2017, and again in July 2019 – and that, because CYS only communicated with him through Mother, he had no idea when and where he was supposed to appear in court. *Id.* at 16-17. Father further argues that the concerns leading to the Children's placement were alleviated, because he had been sober for nearly a year, was employed, and was no longer in a relationship with Mother. *Id.* at 17-18. Father argues that he attempted to attend visitation, but caseworkers did not inform him that transportation would be provided. *Id.* at 18. Father blames his lack of contact and effort on either Mother, for misrepresenting CYS' requirements, or the CYS caseworkers, for not contacting him while he was incarcerated or after his release. *Id.* at 18-19.

The record does not support Father's contentions. Ms. Hacker testified that she is a caseworker with CYS and was assigned to the Children as of November 2017. N.T., 9/17/19, at 6, 56. The case was opened on a general protective services ("GPS") level on March 2, 2017, due to reported parental substance abuse, H.B.'s truancy, and parents not remaining in contact with

CYS. *Id.* at 7-9. The initial caseworker investigated the matter to validate or invalidate whether the reported conduct had actually occurred. *Id.* at 61.

A family service plan was prepared for parents on April 28, 2017, and child permanency plans for the Children on October 2, 2017.[7] *Id.* at 7-13. Mother's and Father's objectives were to meet the Children's basic needs and keep them safe; cooperation and compliance with CYS; cease domestic violence and refrain from verbal or physical fighting; obtain stable housing; refrain from the use of drugs or alcohol, provide two random drug screens, and, if the screens were positive, to undergo drug and alcohol evaluation and follow all recommendations; ensure the Children attended school; and abide by the law. *Id.* at 10-15; *see also* CYS Ex. B-C. Mother and Father were granted biweekly, supervised visitation for an hour. N.T., 9/17/19, at 13-14. At that time, the permanency goal was reunification. *Id.* at 15. The Children's permanency plans were revised in July 2019. *Id.* at 19.

Ms. Hacker testified that CYS had very little contact with Father throughout the pendency of the case. *Id.* Instead, Ms. Hacker communicated mostly with Mother, due to unsuccessful attempts to contact Father at the phone number he had provided to a previous caseworker. *Id.* at 20. Mother represented to Ms. Hacker that she would pass the information along to Father, and Father never requested that Ms. Hacker contact him directly. *Id.* at 29. Ms. Hacker attempted to confirm Father's residence at multiple

---

[7] Mother and Father signed the permanency plan on October 30, 2017. *Id.* at 17.

addresses reported by Mother, but was unable to do so. *Id.* at 26, 33-35. Mother only sporadically returned phone calls. *Id.* at 28. At times, Ms. Hacker could hear a male voice in the background of calls, and Mother implied that this was Father. *Id.* at 30. During this time, Father did not keep CYS updated as to his address. *Id.* at 26.

Father was equally difficult to contact for court-ordered drug screens, and when he did provide a screen on September 26, 2017, and tested negative, his reconfirmation was positive for "extended opiates oral fluid." *Id.* at 21-25. In April of 2018, Ms. Hacker contacted Mother and explained that she and Father had twenty-four hours to provide CYS with a drug screen, and Mother responded that they would attend. *Id.* at 31. However, Mother and Father did not attend the drug screen, and this was considered an "automatic positive." *Id.* Ms. Hacker again attempted to contact Mother and Father for a drug screen in June 2018, but they did not attend. *Id.* at 32.

From November 2017 until July 2019, when she obtained Father's address through the Luzerne County District Attorney's Office, Ms. Hacker was unable to contact Father directly. *Id.* at 26-27. Ms. Hacker documented contact with Mother in November 2017, December 2017, January 2018, March 2018, and June 2018, when Mother provided Ms. Hacker with an address in Berwick, Pennsylvania. *Id.* at 29, 35-36. However, attempted home visits from August 2018 through January 2019 were unsuccessful. *Id.* at 29. Ms. Hacker had no contact with either parent from June 2018 through January

2019. *Id.* at 33-37. Ultimately, Ms. Hacker learned that Father was incarcerated in October 2018 and released on November 30, 2018. *Id.* at 37.

After Father's release, Ms. Hacker attempted to obtain Father's contact information, but eventually she was forced to obtain it from the District Attorney's Office. *Id.* at 38. When Ms. Hacker finally was able to contact Father in July 2019, he did not request visitation due to his work schedule and transportation issues; Ms. Hacker did not inform Father that he could receive assistance with transportation.[8] *Id.* at 39.

Similarly, Father did not follow through with the services he was required to complete. The family was referred to Time Limited Family Reunification, but Mother did not speak with caseworkers until March 2018. *Id.* at 41. Mother and Father completed an intake in May 2018, but they met with workers only twice before falling out of contact again in June 2018. *Id.* at 42. Father did not complete parenting classes, a drug and alcohol evaluation, or any other services offered to Mother and him. *Id.* at 42-43.

When Ms. Hacker made contact with Father in July of 2019, he informed her that he had been incarcerated, but that he was "working on stuff." *Id.* at 45. Father also admitted to having an open case in Luzerne County, Pennsylvania. *Id.* Father did not provide Ms. Hacker with further details

---

[8] At the time of the termination hearing, Ms. Hacker's attempts to contact Father were again unsuccessful. At the August 2019 court hearing, Father reported that he was living at an apartment in West Hazleton, Pennsylvania. *Id.* at 39. However, when Ms. Hacker sent mail to Father at that address in August 2019, the mail was returned unopened. *Id.*

about his work to address CYS' concerns regarding his drug abuse. *Id.* at 45-46.

Father also was inconsistent with visitation of the Children. In 2017, Father attended two of four scheduled visits; in 2018, Father attended four visits of twenty-six scheduled visits. *Id.* at 48-51; *see also* Orphans' Court Opinion, 11/26/19, at 3. Father had no visitation from June 2018 through August 2019. *Id.* Father attended one visit on August 16, 2019, and had another scheduled for September 13, 2019. *See* N.T., 9/17/19, at 51. However, after Father failed to confirm the visit, it was canceled. *Id.*

Ms. Hacker testified that Father did not complete his goals. *Id.* at 51-52. He did not obtain stable housing. *Id.* He did not supply CYS with drug screens and test negative. *Id.* Father did not cooperate with the agency and inform caseworkers of his address. *Id.* Father did not complete the services he was told to complete. *Id.* Father did not communicate with CYS to ask about the Children's welfare or request any medical information for the Children. *Id.* Father did not send birthday or holiday cards or gifts. *Id.* Father did not have regular and ongoing phone contact with the Children. *Id.*

Father testified on his own behalf. He averred he was employed by Dollar Tree chain retail store. *Id.* at 82. Father explained he had been incarcerated on a drug possession charge in Luzerne County from July 29, 2018, through November 30, 2018, but at the time of the hearing, he was released on parole. *Id.* at 84-85. Father admitted that since his November 2018 parole, he had no contact with the Children. *Id.* at 86.

- 17 -

Father claimed that while he was incarcerated, a police officer took his phone, and he did not have the phone numbers memorized. *Id.* at 86. Father also stated that Mother told him CYS would not allow visitation or contact after his release from jail; however, as soon as he received a letter from Ms. Hacker at his brother's house, he contacted CYS as quickly as possible. *Id.* at 87-88. Father stressed that he did give gifts to the Children and that throughout the pendency of the case, his goal has been to better himself for the sake of the Children. *Id.* at 93, 98-99.

Initially, we note that Father's arguments regarding CYS' investigation are waived due to his failure to raise them in the court below. *See* Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). The record indicates that the Children were taken into care on September 14, 2017, and Father signed a permanency plan on October 30, 2017, the same day Children were adjudicated dependent. At no time during the pendency of the case did Father challenge the shelter care order, the adjudication of dependency, or any findings in the permanency review orders issued by the court. Specifically, Father failed to appeal the adjudication of dependency. Indeed, the court noted,

> You're attacking the original placement when there's been plenty of time to do that. Mr. Wintersteen indicated there's been review hearings and so forth all along the way and here we are attacking the investigation which I think there's been a lot of answers on, frankly, and when, in fact, the issue is whether or not the criteria for terminating parental rights has been met.

N.T., 9/17/19, at 76. Accordingly, we agree that Father cannot now claim that the investigation into the Children's dependency was inadequate. Pa.R.A.P. 302.

As noted, *supra*, to seek termination under 23 Pa.C.S.A. § 2511(a)(1), CYS must prove by clear and convincing evidence that a parent demonstrates either a settled purpose of relinquishing a parental claim to a child, **or** a refusal or failure to perform parental duties, for a period of six months prior to the filing of the petition. In the instant case, the petition was filed on April 15, 2019; accordingly, the relevant period began October 15, 2018. During that time, the testimony showed that Father did not perform parental duties as, indeed, he was not in contact in any meaningful manner with either the Children or with CYS caseworkers. N.T., 9/17/19, at 26-27.

Accordingly, we look to Father's explanation for his conduct and the post-abandonment contact between Parent and Child before moving on to analyze 23 Pa.C.S.A. § 2511(b). **Z.S.W.**, **supra**. Father argues that although he intended to parent the Children, he was prevented from doing so first by Mother's alleged subterfuge and then by CYS' alleged failure to advise him of the permanency plan. **See** Father's Brief at 16-18. Notwithstanding, Father admitted to signing the permanency plan and was, accordingly, aware of court dates and his responsibilities in order to reunify with the Children. N.T., 9/17/19, at 111. Additionally, at the hearing, Father stated:

> I just didn't want to -- how shall I say it, and I'll be honest -- from me popping pills and my mind being so screwed up that you guys took my kids over false calls, I was popping a lot of pills. And I'm

going to admit that. I was. And I did not want to go in there and jeopardize to get my kids taken and now my kids have been taken.

*Id.* at 112. Father additionally stated, "I'm not blaming [CYS] or [Mother,] I'm saying I wasn't in the right state of mind last year. I'm different now." *Id.* at 115.

This Court has held that a parent must exercise "reasonable firmness" in resisting obstacles placed in the path of his relationship with his children, and "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities." *In re B.,N.M.*, 856 A.2d at 855. We cannot conclude, from the testimony summarized above, that Father exercised reasonable firmness in attempting to contact either the Children or caseworkers. Further, with regard to his post-abandonment contact, Father stated that, after he was released from prison, he avoided CYS because he did not believe he would be allowed to contact his children. *See* N.T., 9/17/19, at 115. However, even after making contact with Ms. Hacker in July 2019 and establishing that this was not true, Father attended only one visit before missing his second scheduled visit. *Id.* at 51.

In light of all the foregoing, the record substantiates the conclusion that Father, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, evidenced a failure to perform parental duties. *In re Adoption of Charles E.D.M.*, *supra* at 92.

We next decide whether termination was proper under Section 2511(b). Father, however, failed to present any argument and/or discussion related to Section § 2511(b) in his brief. As such, Father waived a challenge related to

§ 2511(b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).

Nevertheless, had Father preserved a claim as to Section § 2511(b), we would find such a claim lacked merit.

This Court has observed:

[Subsection] 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subsection] 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [orphans' court] can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court [has] stated that the [orphans' court] should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks, quotations, and citations omitted).

As noted above, the Orphans' Court observed that Father had no bond with D.B. and only a minimal bond with H.B. Orphans' Court Opinion, 11/26/19, at 7-11. Additionally, the court determined that Father's plan for the Children was tenuous at best, and not suited for stability and permanency.

*Id.* By contrast, the Children were thriving in their foster placement. *Id.* The Orphans' Court opined that the Children's best interests would be served by the involuntary termination of Father's parental rights. *Id.*

We see no error in these conclusions. Father did not offer any testimony pertaining to the Children's bond to him. He testified,

> I want to be in my kids' life. I don't think that somebody that don't even [*sic*] know my kids can show them the love that I can show them, even though I thank God for [foster mother] taking care of my kids, but they can't do what daddy can do. They can never amount to what I do. I'm not trying to point fingers, but I love my kids more than [foster parents] or whoever put together, trust me. And I just feel like I want to ask the [c]ourts just I messed up and I ask God to give me another chance.

N.T., 9/17/19, at 101. However, this Court has stated that a parent's own feelings of love and affection for a child alone will not preclude termination of parental rights. *In re L.M.*, 923 A.2d at 512. Indeed, the sole evidence of any bond between either of the Children and Father was D.B.'s cursory statement *in camera* that he loved Father but did not want to live with him. N.T., 9/17/19, at 125-135.

Ms. Hacker testified that the Children are happy in their pre-adoptive foster home. *See* N.T., 9/17/19, at 53. The Children get along well with their foster parents and their foster parents' biological daughter, and are bonded to them. *Id.* at 53-54. The Children's physical, emotional, mental, and social needs are being met. *Id.* at 54. On the contrary, during the pendency of the case, Father has done nothing to maintain the parent/child bond. *Id.* at 55.

In CYS' opinion, it was in the Children's best interests for Father's parental rights to be terminated. *Id.*

Thus, it is in the Children's best interest to sever the parent-child relationship so that they may achieve permanency in a stable, healthy, environment. *In re Adoption of C.D.R.*, 111 A.3d at 1219. Because Father has proven incapable of providing such an environment for the Children, the court committed no error in terminating Father's parental rights.

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption.[9] Our standard of review in this regard is the same abuse of discretion standard as noted above. *See In the Interest of L.Z.*, 631 Pa. 343, 111 A.3d 1164, 1174 (2015) (*citing In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)), for the proposition that the abuse of discretion standard applies in a dependency matter; *see also In re S.B.*, 208 Pa.Super. 21, 943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement

---

[9] The Orphans' Court did not address the goal change in its Opinion.

for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

(f.1) Additional determination.—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

...

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

Father argues that he has made substantial progress towards alleviating the circumstances leading to the Children's placement. *See* Father's Brief at 11-14. He contends that he was drug-free, had participated in drug and alcohol education, had obtained employment and stable housing, and was "taking steps" to rebuild the bond between the Children and himself. *Id.*

However, the testimony of Ms. Hacker evinced otherwise. As Ms. Hacker stated, Father did not complete any of the goals laid out for him in the permanency plan. *See* N.T., 9/17/19, at 51-52. By the time the goal change petitions were filed in April 2019, Father had not obtained stable housing, had

not supplied CYS with negative drug screens, had not cooperated with the agency by providing his address or phone number, did not complete the services he had been ordered to complete, and did not remain in contact with either CYS or the Children. *Id.* There was a continuing necessity for the Children's placement with their foster parents: Father was not in compliance with any aspect of the family service plan; Father had made no progress in alleviating the circumstances necessitating the original placement; reunification was not feasible where Father was not cooperating with the plan; it would have been difficult to determine a date by which reunification could be achieved, given that Father was not in contact with the agency; and the Children were in placement for at least fifteen of the last twenty-two months. *See*, *e.g.*, *A.B.*, 19 A.3d at 1088-89.

While Father testified that since July of 2019 he had made an effort to rectify the circumstances which led to the Children's placement, his progress came at the eleventh hour. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *A.B.*, 19 A.3d at 1089. As previously discussed it was in the Children's best interests to find some measure of permanency and stability with their foster parents. The court did not err in changing their permanency goal from reunification to adoption. *S.B.*, 943 A.2d at 977.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>05/20/2020</u>